UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

## 05 10006 JLT

CROSS COUNTRY MOTOR CLUB INC., AND
CROSS COUNTRY MOTOR CLUB OF
CALIFORNIA, INC.,

                    Plaintiffs,

                v.

SYKES CANADA CORPORATION

                  Defendant.

MAGISTRATE JUDGE _Newjudse_

CIVIL ACTION
NO.

RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _1\13\05_

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Cross Country Motor Club, Inc. and Cross Country Motor Club of California, Inc. (collectively, "Cross Country"), bring this action against Defendant, Sykes Canada Corporation ("Sykes"), seeking money damages for Sykes' refusal to pay Cross Country for services rendered pursuant to a Mutual Brokerage Agreement. Cross Country also seeks a declaration, pursuant to 28 U.S.C. §2201, that Sykes has an obligation to continue to pay brokerage fees to Cross Country.

### JURISDICTION AND VENUE

1.    The Court has personal jurisdiction over Sykes because it conducted business in Massachusetts, and because it is otherwise subject to the Court's jurisdiction under the Massachusetts Long Arm Statute, M.G.L. c. 223A, §3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

2.    Venue is proper in this district under 28 U.S.C. § 1391.

### PARTIES

3.    Cross Country Motor Club, Inc. is a Massachusetts corporation with a principal place of business located in Medford, Massachusetts.

4.    Cross Country Motor Club of California, Inc. is a California corporation with a principal place of business located in Medford, Massachusetts.

5.    On information and belief, Sykes Canada Corporation is an Ontario Corporation with a principal place of business located in London, Ontario. Sykes is the successor-in-interest to National Auto League, Inc. ("NAL") and Oracle Service Networks Corporation ("Oracle") and reference herein to Sykes includes its predecessors NAL and Oracle.

## FACTS

6.    In or around late 1989 and early 1990, representatives of NAL, contacted representatives of Cross Country in Massachusetts to discuss the possibility of entering into a contractual relationship.

7.    At that time, Cross Country had business relationships with numerous automobile manufacturers and distributors, NAL had a strong desire to expand its business in Canada to include these entities, and Cross Country believed it could aid NAL in expanding its business with these entities. Likewise, NAL had business relations with certain consumer finance companies, Cross Country had a desire to expand its business in the United States to include these entities, and NAL believed it could aid Cross Country in expanding its business with these entities.

8.    On or about March 1, 1990, Cross Country and NAL entered into a Mutual Brokerage Agreement (the "Agreement"). The Agreement stated, among other things, that (i) NAL desired to expand its business in Canada and Cross Country was willing to assist NAL in such expansion, and (ii) Cross Country desired to expand its business in the United States and NAL was willing to assist Cross Country in such expansion. A copy of this Agreement is attached hereto as Exhibit 1.

9.    Pursuant to Paragraphs 2 and 3 of the Agreement, NAL and Cross Country mutually appointed each other as their respective brokers.

-2-

10.    Paragraph 4 of the Agreement provides as follows:

A brokerage fee shall be payable in the amount equal to ten percent (10%) of the sum actually received pursuant to any contract entered into resulting, in whole or in part, from the efforts of the broker. A contract shall be conclusively deemed to have resulted from the efforts of the broker (1) in the case of a contract entered into by NAL with any business described on Exhibit "B" and (ii) in the case of any contract entered into by Cross Country with any business described on Exhibit "A". Commissions shall be payable over the full term of the Agreement entered into and any extensions thereof. Commissions shall be payable over the full term of any contract entered into during the term of this Agreement and over the full term of any extension of such contract, even though the term of such contract, as extended, may extend beyond the expiration or other termination of this Agreement. A contract entered into within six (6) months after the expiration or other termination of a contract described in the preceding sentence shall be deemed to be an extension thereof even though the terms of such contract may differ from the original contract and commissions shall be payable with respect thereto, except that commissions shall be payable only during the first five (5) years of such contract.

11.    Paragraph 8(A) of the Agreement provides that "[a]ny agreement entered into by NAL with any business listed in Exhibit 'B' during the one (1) year period following the expiration or other termination of this Agreement which was not a business with which NAL had an agreement prior to the expiration or other termination of this Agreement, shall be deemed to have been entered into during the term of this Agreement so that a commission shall be payable to Cross Country, but only for the first five (5) years of the term of such agreement."

12.    The parties also agreed that, "[n]otwithstanding the expiration or other termination of this Agreement, the obligations to pay commissions shall survive." Exhibit 1, Paragraph 9.

13.    On or about August 1, 1993, Oracle, a successor-in-interest to NAL, and Cross Country entered into a First Amendment of Agreements (the "Amendment"). A copy of the Amendment is attached hereto as Exhibit 2.

14.    Pursuant to the Amendment, the brokerage fees to be paid pursuant to paragraph 4 of the Agreement was changed from ten percent to five percent and the term of the Agreement was extended to December 31, 2000.

-3-

15.    Since March 1, 1990, Cross Country has introduced Sykes to numerous automobile manufacturers and distributors, increasing their visibility and operational viability with these entities. Thereafter, Sykes has entered into contracts with automobile manufacturers and distributors doing business in Canada.

16.    Pursuant to the Agreement, Sykes has paid some commissions to Cross Country for certain contracts they have entered into with automobile manufacturers and distributors. However, Sykes has unilaterally and without notice improperly withheld certain payments called for by the Agreement on the supposed basis that Cross Country is only entitled to a commission if the contract otherwise covered by the Agreement concerned the provision of roadside assistance. The Agreement contains no such limitation.

17.    Further, despite the fact that the Agreement specifically provides for the continuation of commissions after the termination of the term of the Agreement, Sykes has failed to pay various commissions due on the Agreement after its termination. Specifically, Sykes has incorrectly and improperly withheld payment for various contracts whose terms were extended after the expiration of the Agreement. Similarly, Sykes has improperly failed to pay commissions on certain contracts entered into within one year of the termination of the Agreement.

18.    Because Sykes has failed to pay Cross Country brokerage fees to which Cross Country is entitled, it has breached its obligations under the Agreement. Pursuant to Paragraph 18 of the Agreement, Sykes must pay interest at a rate of 18% per annum, calculated and payable monthly, on amounts it has not paid and on amounts previously paid late. In addition, pursuant to paragraph 12(a), Sykes is to pay Cross Country's litigation costs and expenses arising out of its breach of the Agreement.

## COUNT I
## BREACH OF CONTRACT
### Failure to Pay for Services Rendered

19.    Cross Country incorporates the allegations of Paragraphs 1-18 as if set fully herein.

-4-

20.    Pursuant to the Agreement, Sykes agreed to pay Cross Country brokerage fees for contracts entered into by Sykes with any business listed on Exhibit B of the Agreement.

21.    Sykes has failed to pay Cross Country the brokerage fees that Cross Country is entitled to under the Agreement.

22.    By failing and refusing to pay Cross Country these brokerage fees, Sykes is in breach of its contractual obligations to Cross Country.

## COUNT II
## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

23.    Cross Country incorporates the allegations of Paragraphs 1-22 as if set fully herein.

24.    By failing to pay monies due to Cross Country in accordance with its contractual obligations to do so, Sykes has breached the covenant of good faith and fair dealing implied in the parties' contractual dealings, causing Cross Country to suffer damages in an amount to be proven at trial.

## COUNT III
## DECLARATORY RELIEF
## Sykes Is Contractually Obligated to Pay Cross Country Brokerage Fees

25.    Cross Country incorporates the allegations of Paragraphs 1-24 as if set fully herein.

26.    The Agreement provides, among other things, that Sykes' obligation to pay brokerage fees to Cross Country survives following the expiration of the Agreement. Sykes contends that it no longer has an obligation to pay brokerage fees to Cross Country.

27.    There is an actual case and controversy between the parties concerning their rights under the Agreement, on which a declaratory judgment is necessary and appropriate.

28.    Cross Country is entitled to a declaration that Sykes is contractually obligated to pay brokerage fees to Cross Country even though the term of the Agreement has expired.

WHEREFORE, Cross Country respectfully requests that the Court:

(a)    enter judgment for Cross Country and against Sykes on Counts I-II of the Complaint;

(b)    award Cross Country interest, its costs and attorneys' fees;

(c)    declare, pursuant to 28 U.S.C. §2201, that Sykes is contractually obligated to pay brokerage fees to Cross Country even though the term of the Agreement has expired; and

(d)    grant such other and further relief as this Court shall deem just and equitable.

## DEMAND FOR JURY TRIAL

Cross Country demands a jury trial on all claims that are triable to a jury.

Respectfully submitted,

CROSS COUNTRY MOTOR CLUB, INC. and
CROSS COUNTRY MOTOR CLUB OF
CALIFORNIA, INC.,

By their attorneys,

_William F. Benson_____
Victor H. Polk, Jr. (BBO # 546099)
William F. Benson (BBO #646808)
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110
(617) 951-8000

Dated:  January 13, 2005

-6-

Exhibit 1

NTW
June 14, 1990

## MUTUAL BROKERAGE AGREEMENT

AGREEMENT made as of the first day of March, 1990.

B E T W E E N:

NATIONAL AUTO LEAGUE INC., an Ontario Corporation

hereinafter referred to as "NAL"


OF THE FIRST PART

and

CROSS COUNTRY MOTOR CLUB, INC., a Massachusetts corporation

and CROSS COUNTRY MOTOR CLUB OF CALIFORNIA, INC.,

a California corporation, hereinafter collectively

referred to as "CROSS COUNTRY"


OF THE SECOND PART


WHEREAS NAL presently provides automobile club benefits ("NAL Services") to individuals and/or corporations ("NAL Members") in Canada.

AND WHEREAS Cross Country presently provides automobile club benefits and/or roadside assistance services ("Cross Country Services") to individuals and/or corporations ("Cross Country Members") in the United States of America.

AND WHEREAS, NAL desires to expand its business in Canada and Cross Country is willing to assist NAL in such expansion.

AND WHEREAS Cross Cross Country desires to expand its business in the United States and NAL is willing to assist Cross Country in such expansion.

NOW THEREFORE IN CONSIDERATION of the covenants and agreements herein set forth the parties agree as follows:

1.  A.   The recitals contained above are true in substance and in fact and are incorporated by reference herein.

NTW
June 14, 1990

   B.    Subject to the provisions herein, the term of this
         agreement shall expire at midnight U.S. Eastern Standard
         Time on December 31, 1995.
2.  NAL hereby appoints Cross Country as its broker for a period
ending at midnight Eastern Standard Time on December 31, 1995.
Such appointment shall be as exclusive broker with regard to the
businesses described on Exhibit "B" attached hereto and hereby
made a part hereof.

3.  Cross Country hereby appoints NAL as its broker for a period
ending at midnight Eastern Standard Time on December 31, 1995.
Such appointment shall be as exclusive broker with regard to the
businesses described on Exhibit "A" attached hereto and hereby
made a part hereof.

4.  A brokerage fee shall be payable in an amount equal to ten
percent (10%) of the sum actually received pursuant to any
contract entered into resulting, in whole or in part, from the
efforts of the broker.  A contract shall be conclusively deemed to
have resulted from efforts of the broker (i) in the case of a
contract entered into by NAL with any business described on
Exhibit "B" and (ii) in the case of any contract entered into by
Cross Country with any business described on Exhibit "A".
Commissions shall be payable over the full term of the Agreement
entered into and any extensions thereof. Commissions shall be
payable over the full term of any contract entered into during the
term of this Agreement and over the full term of any extension of
such contract, even though the term of such contract, as extended,
may extend beyond the expiration or other termination of this
Agreement.  A contract entered into within six (6) months after
the expiration or other termination of a contract described in the
preceding sentence shall be deemed to be an extension thereof even
though the terms of such contract may differ from the original
contract and commissions shall be payable with respect thereto,
except that commissions shall be payable only during the first
five (5) years of such contract.

5.  Nothing in this Agreement shall be construed to require NAL or
Cross Country to enter into any agreement with any business
brought to it by the other party.

5.1  In the event NAL secures or is in a position to secure an
account in the United States the following provisions shall apply:

(a)  NAL may service such account on its own or by a company
     wholly owned by NAL or through Cross Country under the
     Service Agreement, without any brokerage fee being
     payable to Cross Country in connection therewith;

(b)  If NAL does not wish to service such account as
     provided in 5.1(a), it shall then request Cross Country
     to do so.  In the event Cross Country does not wish to
     service such account, NAL shall be at liberty to

-2-

NTW
June 14, 1990

contract with another company to service such account
on the same terms as were indicated to Cross Country.

5.2   In the event Cross Country secures or is in a position
to secure an account in Canada the following provisions
shall apply:

(a)   Cross Country may service such account on its own or by
      a company wholly owned by Cross Country or its parent
      or through NAL under the Service Agreement, without any
      brokerage fee being payable to NAL in connection
      therewith;

(b)   If Cross Country does not wish to service such account
      as provided in 5.2(a), it shall then request NAL to do
      so.   In the event NAL does not wish to service such
      account, Cross Country shall be at liberty to contract
      with another company to service such account on the
      same terms as were indicated to NAL.

5.3   Notwithstanding anything contained herein to the
contrary, in the event Cross Country begins to carry on an
automobile club business in Canada for its own account, then
NAL shall have the right to terminate this agreement upon
seven (7) days notice to Cross Country and if this agreement
shall be so terminated, then the following shall apply:

(a)   Each brokerage payment payable by NAL to Cross Country
      for a contract entered into prior to the date of
      termination of this agreement shall continue to be paid
      until the expiry ("Expiration Time") of the then
      existing term of such contract.   From and after the
      Expiration Time, no brokerage or other fees shall be
      payable by NAL pursuant to such contract;

(b)   Each brokerage payment payable by Cross Country to NAL
      shall continue in accordance with Paragraph 4 herein
      and shall survive the expiration or termination of this
      agreement; and

(c)   This agreement shall terminate on the termination date
      set forth in the notice of termination, save and except
      for the payment obligations referred to in this
      Section 5.3 and/or Section 5.4 and except for those
      provisions of this agreement which are to survive
      expiration or termination hereof as specified in
      Paragraph 14 (except that Paragraph 4 shall survive
      only as limited by Paragraphs 5.3 and 5.4).

5.4   Notwithstanding anything contained herein to the
contrary, in the event NAL begins to carry on an automobile
club business in the United States of America for its own
account, then Cross Country shall have the right to
terminate this agreement upon seven (7) days notice to NAL

-3-

NTW
June 14, 1990

account, then Cross Country shall have the right to
terminate this agreement upon seven (7) days notice to NAL
and if this agreement shall be so terminated, then the
following shall apply:

(a)  Each broker payment payable by Cross Country to NAL for
     a contract entered into prior to the date of
     termination of this agreement shall continue to be paid
     until the expiry ("Expiration Time") of the then
     existing term of such contract.  From and after the
     Expiration Time, no brokerage or other fees shall be
     payable by Cross Country pursuant to such contract;

(b)  Each brokerage payment payable by NAL to Cross Country
     shall continue in accordance with Paragraph 4 herein
     and shall survive the expiration or termination of this
     agreement; and

(c)  This agreement shall terminate on the termination date
     set forth in the notice of termination, save and except
     for the payment obligations referred to in this
     Section 5.4 and/or in Section 5.3 and save and except
     for those provisions of this agreement which are to
     survive expiration or termination hereof as specified
     in Paragraph 14 (except that Paragraph 4 shall survive
     only as limited by paragraphs 5.3 and 5.4).

6.   Once an agreement has been entered into for which a
     brokerage fee is payable hereunder, the broker shall be
     entitled to receive, within thirty (30) days after the
     end of each month, a report showing all income received
     pursuant to the contract entered into and the report
     shall be accompanied by the commission payable with
     respect thereto.  If pursuant to the contract entered
     into, the sums received are in Canadian dollars, then
     the commission shall likewise be payable in Canadian
     dollars, and if the payments received under the
     contract are in U.S. dollars, then the commission shall
     be payable in U.S. dollars.

     Each party shall maintain accounting books and records
     in accordance with generally accepted accounting
     principles relating to sums received pursuant to the
     contract hereunder.  The amounts paid are payable to
     the broker.  The broker shall have the right from time
     to time, itself or through an accountant, to inspect
     and audit such books and records.  Each party shall
     maintain and preserve such books and records during the
     term of this Agreement and for at least five (5) years
     thereafter.

7.   A.  The parties herein understand and agree that during
     the term of this Agreement and any subsequent extension
     or renewal thereof each party will gain knowledge of

-4-

NTW
June 14, 1990

this Agreement (all of which is herein referred to as "Confidential Information") which is confidential to the owning party ("Owning Party"). It is agreed that such Confidential Information furnished to, or acquired directly or indirectly by, the other party, is proprietary to the Owning Party and the other party will use the same degree of care to preserve the confidentiality of such Confidential Information as it prudently would with its own Confidential Information. Notwithstanding the foregoing, the following described information shall be deemed to be Confidential Information without any further notice, but all other information which falls within the previous definition of "Confidential Information" may become "Confidential Information" only upon prior written notice from the party who is entitles to invoke the confidentiality with respect thereto, specifying with particularity the information which is to be so classified:

(i)     Names, addresses and demographic data relating to members of the auto and/or motorclub operated by any of the parties:

(ii)    Names of the clients of the parties:

(iii)   Agreements between the parties and their clients, including the existence and contents;

(iv)    Proposals submitted by a party to, and/or received by a party from, its clients;

(v)     Names, addresses and demographic data relating to a party's Designees;

(vi)    Vehicular problems and/or manufacturer usage statistics;

(vii)   Service procedures;

(viii)  Marketing programs;

(ix)    Computer software systems, including without limitation, the nature and/or contents of reports generated thereby.

B.    All original documents and copies of such Confidential Information, however and wherever produced shall be the sole property of the Owning Party and all such originals or copies shall be surrendered to the Owning Party forthwith on the written request of the Owning Party and at the expiration or sooner termination of this Agreement.

NTW
June 14, 1990

C.   The parties herein agree that the Confidential Information will be used only for the purposes contemplated or permitted by this Agreement and for no other purpose.

D.   The obligations imposed by this section do not extend to:

(i)    Confidential Information which becomes publicly known through no act of the party obtaining the information;

(ii)   Confidential Information properly made available to the party obtaining the confidential or proprietary information without any restrictions from a source other than the Owning Party;

(iii)  Confidential Information which the party obtaining the information can show by written records was in its possession prior to disclosure by the Owning Party;

(iv)   Confidential Information is approved by the Owning Party for disclosure without restriction in a written document signed by a duly authorized officer

(v)    Information required by law to be furnished to governmental authorities (federal, state and/or local), including without limitation administrative and/or judicial bodies.

E.   It is understood and agreed that the obligations imposed by this section shall survive the expiration or sooner termination of this Agreement and shall remain in full force and effect.

8.  A.   Any agreement entered into by NAL with any business listed in Exhibit "B" during the one (1) year period following the expiration or other termination of this Agreement which was not a business with which NAL had an agreement prior to the expiration or other termination of this Agreement, shall be deemed to have been entered into during the term of this Agreement so that a commission shall be payable to Cross Country, but only for the first five (5) years of the term of such agreement.

B.   Any agreement entered into by Cross Country with any business listed in Exhibit "A" during the one (1) year period following the expiration or other termination of this Agreement which was not a business with which Cross Country had an agreement prior to the expiration or other termination of this Agreement, shall be deemed to have been entered into during the term of this Agreement so that a commission shall be payable to NAL, but only for the first five (5) years of the term of such agreement.

NTW
June 14, 1990

9.   Notwithstanding the expiration or other termination of this Agreement, the obligations to pay commissions shall survive.

10. All notices, requests, demands or other communications required or permitted to be given hereunder shall be in writing by registered mail, postage prepaid, addressed to such other party or delivered to such party (a) in the case of NAL at 371 King Street, Box 5845, London, Ontario, N6A 4T4 Attention: Dave LeClair, and (b) in the case of Cross Country, 270 Mystic Avenue, Medford, MA 02155, Attention: Sidney D. Wolk, or at such other addresses as may be given by any party to the other in writing from time to time and such notices, requests, demands and other communications shall be deemed to have been received when delivered, or if mailed, three (3) business days after the mailing thereof.

11. NAL shall not approach any of the businesses described in Exhibit "B", directly or indirectly, except through and in the presence of representatives of Cross Country, unless NAL shall first obtain the written consent of Cross Country, which consent shall not be arbitrarily and unreasonably withheld.

Cross Country shall not approach any of the businesses described on Exhibit "A", directly or indirectly, except through and in the presence of representatives of NAL, unless Cross Country shall first obtain the written consent of NAL, which consent shall not be arbitrarily and unreasonably withheld.

NAL shall periodically advise Cross Country of its intentions with regard to approaching any business entity of the character described in Exhibit "B" for the purpose of obtaining an agreement for the benefit of Cross Country so as to get the benefit of Cross Country's thinking with regard thereto.

Cross Country shall periodically advise NAL of its intentions with regard to approaching any business entity of the character described in Exhibit "A" for the purpose of obtaining an agreement for the benefit of NAL so as to get the benefit of NAL's thinking with regard thereto.

12. A.   NAL will, at NAL's expense defend and indemnify and hold Cross Country harmless from and against all present and future claims, demands, suits, actions, proceedings, litigation costs and expenses arising out of or in any way related to the breach by or negligence of NAL in performing its duties and obligations as herein set forth.

B.   Cross Country will, at Cross Country's expense, defend and indemnify and hold NAL harmless from and against all present and future claims, demands, suits, actions, proceedings, litigation costs and expenses arising out of or in any way related to the breach by or the negligence of Cross Country in performing its duties and obligations as herein set forth.

-7-

NTW
June 14, 1990

13. A.    Cross Country agrees that it is not an agent of NAL but is an independent contractor completely separate from NAL and that Cross Country has no authority to bind, or attempt to bind NAL in any manner or form whatsoever or to assume or incur any obligation or responsibility, express or implied for or on behalf of or in the name of NAL.    This Agreement shall not be construed so as to constitute Cross Country as a partner, joint venturer, agent or representative of NAL.    If requested by NAL, Cross Country agrees to execute such documents as may be necessary to clearly indicate that Cross Country is acting as an independent contractor as aforesaid.

     B.    NAL agrees that it is not an agent of Cross Country but is an independent contractor completely separate from Cross Country and that NAL has no authority to bind, or attempt to bind Cross Country in any manner or form whatsoever or to assume or incur any obligation or responsibility, express or implied for or on behalf of or in the name of Cross Country.    This Agreement shall not be construed so as to constitute NAL a partner, joint venturer, agent or representative of Cross Country.    If requested by Cross Country, NAL agrees to execute such documents as may be necessary to clearly indicate that NAL is acting as an independent contractor as aforesaid.

14. The following paragraphs of this Agreement shall survive the expiration or termination hereof: 4, 6, 7, 8, 9, 12, 13, 14, 15, 18 and 19.

15. Neither party shall have the right to assign its rights under this Agreement without the prior written consent of the other which consent may not be unreasonably or arbitrarily withheld. No consent shall be necessary in the event of an assignment to a subsidiary or an affiliate provided, however, the assignor and the assignee shall become jointly and severally liable hereunder and the assignee shall provide written affirmation thereof. In the event of an assignment hereunder to which the non-assigning party fails to consent (and the withholding of such consent shall have been reasonable), the sole remedy of the non-consenting party shall be to terminate this Agreement within the ninety (90) day period following the assignment or receipt of knowledge of the assignment, whichever is later, upon sixty (60) day prior notice, and on such termination both parties shall be released from all obligations herein, save and except for any payment obligations accrued or incurred and except for obligations which are to survive the expiration or other termination hereof.

16. Subject to the restrictions on assignment as herein contained, this Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

17. No failure of either party to exercise any rights given to it hereunder or to insist upon strict compliance of any obligation

NTW
June 14, 1990

hereunder shall constitute a waiver by such party to demand exact
compliance with the terms hereof.

18. Any amounts required to be paid herein and not paid when due
shall bear interest at the rate of eighteen percent (18%) per
annum, calculates and payable monthly.

19. In the event of a breach of the within Agreement by either
party ("Offending Party") and provided such breach has not been
remedied by the Offending Party within fifteen (15) days of
receiving notice thereof by the other party ("Other Party"), the
Other Party may, in addition to any other rights it may have,
terminate this Agreement and upon such termination, both parties
shall be released from all obligations hereunder, save and except
(i) for any payment obligations accrued or incurred, (ii) such
damages as may be owed by either party herein to the other, and
(iii) such rights which pursuant to this Agreement are to survive
the expiration or other termination hereof.

20. In the event that one party becomes insolvent, makes a
general assignment for the benefit of creditors, is placed in
receivership, ceases or takes any steps to cease or threatens to
cease the operation of its business or a petition in bankruptcy
is filed against such party, the other party may forthwith
terminate this Agreement and upon such termination, both parties
shall be released from all obligations herein save and except for
any payment obligations, accrued or incurred and except for
obligations which are to survive the expiration or other
termination hereof.

21. Except for a certain Service Agreement of even date herewith
pertaining to providing Emergency Road Services ("the Service
Agreement"), this instrument contains the entire and only
agreement between the parties, and no oral statements or
representations or prior written matter not contained herein
shall have any force or effect.  This Agreement shall not be
modified in any way, except by a writing signed by both parties
by a duly authorized representative.  The aforementioned Service
Agreement shall be independent of the within Agreement and no
expiration or termination of this Agreement shall have any effect
upon the aforementioned Service Agreement.

22. If any of the states shall be a state in which Cross Country
Motor Club of California, Inc., rather than Cross Country Motor
Club, Inc., shall be permitted to conduct business, then with
respect of those states this Agreement shall be deemed an
agreement between NAL and Cross Country Motor Club of California,
Inc., and accordingly Cross Country Motor Club of California,
Inc. joins in this Agreement for such purposes, and any
references to Cross Country, where applicable, shall mean and
refer to Cross Country Motor Club of California, Inc.  Until
further notice, all sums shall be made payable to Cross Country
Motor Club, Inc. and shall be delivered to it at the place above
provided for the rendering of notices.  Any notice given by or to

-9-

NTW
June 14, 1990

Cross Country Motor Club, Inc. shall be deemed notice also given by or to Cross Country Motor Club of California, Inc.

IN WITNESS WHEREOF the parties have signed this agreement as an agreement under seal.

SIGNED, SEALED AND DELIVERED )
 in the presence of )
   ) NATIONAL AUTO LEAGUE, INC.
   )
   )
   ) PER: _David R. Clair_ c/s
   ) (Duly Authorized Individual)
   )
   ) CROSS COUNTRY MOTOR CLUB, INC.
   )
   ) PER: _____ c/s
   ) (Duly Authorized Individual)
   )

   ) CROSS COUNTRY MOTOR CLUB OF
   ) OF CALIFORNIA, INC.
   )
   ) PER: _____ c/s
    (Duly Authorized Individual)

ntw/crossagr/.au7
nal brokers agr 6/14/90

-10-

<u>EXHIBIT "A"</u>

A.    All consumer finance companies, such as, by way of
example, AVCO and Beneficial Finance, of whatsoever
name, nature and description, now or hereafter doing
business in the United States.  For clarification
purposes, it is understood that not all businesses which
provide financing to consumers are consumer finance
companies, and accordingly, it is understood, by way of
examples, that banks, credit unions and savings and loan
companies are not considered consumer finance companies.

B.    American Express Company

ntw/crossagr/.ar6
nal exhibit a

### "EXHIBIT "B

All automobile manufacturers and distributors of whatsoever name, nature and description, now or hereafter doing business in Canada , by themselves or through subsidiaries or affiliates, excluding only Jaguar, Lexus and Lada.  It is understood that a retail automobile dealership is not a distributor.

ntw/crossagr/.ar5
nal exhibit b

Exhibit 2

NTW
7/30/93

## FIRST AMENDMENT OF AGREEMENTS

Reference is hereby made to that certain Mutual
Brokerage Agreement dated as of March 1, 1990 and that
certain Service Agreement also dated as of March 1, 1990,
both of which Agreements were between NATIONAL AUTO LEAGUE
INC. ("NAL"), of the first part, and CROSS COUNTRY MOTOR
CLUB, INC. and CROSS COUNTRY MOTOR CLUB OF CALIFORNIA, INC.
(hereinafter collectively referred to as "Cross Country"),
of the second part. NAL has changed its name and is
presently known as ORACLE SERVICE NETWORKS CORPORATION
("Oracle")

FOR GOOD AND VALUABLE CONSIDERATION, receipt whereof is
hereby severally acknowledged, the parties hereto do hereby
amend said Agreements in the following respects:

1.    The Mutual Brokerage Agreement is hereby amended in
the following respects:

      (a)    Effective with respect to sums actually
            received under the contracts referred to in
            Paragraph 4 from and after August 1, 1993,
            the percentage referred to in the first
            sentence of Paragraph 4 shall be five percent
            (5%) rather than ten percent (10%). The ten
            percent (10%) shall apply to all sums
            received under the contracts referred to in
            Paragraph 4 prior to August 1, 1993.

      (b)    There is hereby substituted for the date
            December 31, 1995 appearing in Paragraph 1.B.
            the date December 31, 2000.

2.    The Service Agreement is hereby amended by
substituting for the date December 31, 1995 appearing in
Paragraph 1.B. the date December 31. 2000.

In all other respects the Mutual Brokerage Agreement and

NTW
7/30/93

the Service Agreement, as amended hereinabove, are ratified and confirmed.

EXECUTED under seal as of the first day of August, 1993.

CROSS COUNTRY MOTOR CLUB, INC.

By:

CROSS COUNTRY MOTOR CLUB OF
    CALIFORNIA, INC.

By:

ORACLE SERVICE NETWORKS
    CORPORATION

By:

ntw/crossagr/.chl

**JS 44** (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Cross Country Motor Club Inc., and
Cross Country Motor Club of California

## DEFENDANTS

Sykes Canada Corporation

**(b)** County of Residence of First Listed Plaintiff __Middlesex__
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____ Canada
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Victor H. Polk, Jr. and William F. Benson
Bingham McCutchen LLP
150 Federal Street, Boston, MA  02110
Tel. 617.951.8000

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
       Plaintiff

☐ 3  Federal Question
       (U.S. Government Not a Party)

☐ 2  U.S. Government
       Defendant

☒ 4  Diversity
       (Indicate Citizenship of Parties
       in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 365 Personal Injury — Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans' Benefits | ☐ 350 Motor Vehicle / **PERSONAL PROPERTY** | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** / ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIW C/DIW W (405 (g)) ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights / ☐ 535 Death Penalty | | | |
| ☐ 290 All Other Real Property | ☐ 540 Mandamus & Other / ☐ 550 Civil Rights / ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
      Proceeding

☐ 2 Removed from
      State Court

☐ 3 Remanded from
      Appellate Court

☐ 4 Reinstated or
      Reopened

☐ 5 Transferred from
      another district
      (specify)

☐ 6 Multidistrict
      Litigation

☐ 7 Appeal to
      District
      Judge from
      Magistrate
      Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

Plaintiffs seek money damages for defendant's refusal to pay for services rendered. Plaintiffs also seek a declaration, pursuant to 28 U.S.C. § 229, that defendant has an obligation to continue to pay brokerage fees to plaintiffs.

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
   UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S)
IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE  1/13/05

SIGNATURE OF ATTORNEY OF RECORD
*Will. F. Benson*

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only)_____

    Cross Country Motor Club Inc. v. Sykes Canada Corporation

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

    ☐   I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    ☐   II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,          *Also complete AO 120 or AO 121
             740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.              for patent, trademark or copyright cases

    ☒   III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
             315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
             380, 385, 450, 891.

        IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
             690, 810, 861-865, 870, 871, 875, 900.

        V.    150, 152, 153.

3.  Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

    _____

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                              YES ☐    NO ☒

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

                                                              YES ☐    NO ☒

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                              YES ☐    NO ☐

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                              YES ☐    NO ☒

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                              YES ☐    NO ☒

    A.  If yes, in which division do all of the non-governmental parties reside?

        Eastern Division ☐        Central Division ☐        Western Division ☐

    B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division ☒        Central Division ☐        Western Division ☐

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

                                                              YES ☐    NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME  Victor H. Polk, Jr. and William F. Benson

ADDRESS  Bingham McCutchen LLP, 150 Federal Street, Boston, MA  02110

TELEPHONE NO. 617.951.8000

(Coversheetlocal.wpd - 10/17/02)